N. B. Whitcomb Coca-Cola Syndicate, Trust Company of Georgia, Syndicate Manager, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 76367. Promulgated April 28, 1937.

*John E. McClure, Esq.,* and *Pope F. Brock, Esq.,* for the petitioner.
*Ralph E. Smith, Esq.,* for the respondent.

#### OPINION.

Murdock: The Commissioner determined a deficiency in income tax of $79,817.41 against the N. B. Whitcomb Coca-Cola Syndicate for the period January 1 to March 17, 1930. The question for decision by the Board is whether the syndicate in question was an association taxable as a corporation. If it was, there is the question of the profit which it realized. But if it was not, then there was no taxpayer, and, consequently, no deficiency.

The syndicate was formed on October 29, 1929, for the purpose of protecting the market value of certain stock during the period of violent market fluctuations which began in the latter part of 1929. The syndicate was dissolved on March 17, 1930. The agreement was as follows:

This Agreement, made and entered into this the 29th day of October, 1929, by and between N. B. Whitcomb, party of the first part (hereinafter for convenience called "Manager"), and the several Subscribers hereto, parties of the second part (hereinafter for convenience called "Subscribers").

#### WITNESSETH:

That Whereas, the parties hereto desire to form a Syndicate for the primary purpose of buying and selling shares of the common stock of COCA-COLA Company and/or COCA-COLA International Corporation.

Now, Therefore, in consideration of the mutual covenants herein contained, the Manager agrees with the Subscribers, and each of them, and the Subscribers agree with the Manager and with one another as follows, to-wit:

1: A Syndicate is hereby formed for the primary purpose of buying and selling shares of the Common Capital stock of The Coca-Cola Company, a Delaware Corporation. The Manager may be a member of said Syndicate and a Subscriber hereto, as such member, and he and each of the other Subscribers hereto, for himself and not for any other, hereby subscribes to an interest in said Syndicate represented by the number of shares of stock set opposite his. name.

2: The Manager is authorized to purchase and sell, for the account of each Subscriber, common capital stock of The Coca-Cola Company, of no nominal or par value, not to exceed at any one time the number of shares set opposite his

name. The Manager shall not have in hand, as the result of such purchases, at any one time more than one hundred thousand (100,000) shares of the common capital stock of The Coca-Cola Company; or, should the total subscriptions be less than one hundred thousand (100,000) shares, the Manager shall not have in hand at any time more than the total number of shares subscribed.

3: Each Subscriber agrees to pay to the Manager, as soon as this agreement goes into effect, a sum equivalent to twenty ($20.00) dollars a share for each share of stock subscribed for by him, when and as called by the Manager.

4: All stocks bought by the Manager pursuant to the authority given to him by each of the Subscribers, shall be carried by the Manager in the Syndicate account and the Subscribers hereto shall all participate in each purchase or sale in proportion to their interest in the Syndicate.

5: The Manager is authorized to call upon the Subscribers for payment from time to time for all, or any part, of the stock purchased by such Manager hereunder, and each Subscriber will pay promptly the amount of such call or calls in Atlanta or New York funds; Provided the total amount of calls upon each Subscriber shall not exceed in his individual liability as indicated by his subscription, and all calls for payment shall be made pro rata among the Subscribers according to their subscriptions. The payment of such calls shall be made to the Manager two days after receiving notice thereof, in writing either by telegram or by letter addressed to each Subscriber at the address which appears opposite his signature hereto.

6: Should any subscriber fail to make payment or payments as and when called, the Manager may sell rights and interest of such defaulting Subscriber in this agreement and in the shares of stock purchased under it, at public or private sale, at any time thereafter without advertisement or notice, and after deducting all interest charges or other costs and expenses properly chargeable to such defaulting Subscriber, the residue shall be applied to any liability or indebtedness of such defaulting Subscriber arising hereunder, and if it be not sufficient to discharge such liability or indebtedness, such subscriber shall immediately pay and discharge the deficiency. Should such sale of the defaulter's interest as aforesaid, be sufficient to pay all interest charges, costs, expenses and liability or indebtedness arising hereunder, and there be an over plus, it shall be paid to the defaulting Subscriber.

The Manager may purchase, at any such sale, for the benefit of the non-defaulting Subscribers, the rights and interest of the defaulting Subscriber, and may apportion an assessment among such non-defaulting Subscribers in proportion to their several interests and call for payment thereof, which payment shall be made within two (2) days after receiving notice of such call, as hereinbefore provided; but no Subscriber shall in any event be liable for calls or assessments in excess of the liabilities assumed by him by his subscription hereto.

7: The Manager shall have the sole direction and management and the entire control of the conduct of the business and transactions of the Syndicate. He shall have the power, in his sole and unrestricted discretion, to buy and sell said shares of stock for the account of the Syndicate, either on the open market or at public or private sale, and at such prices and on such terms as he may see fit; except that he may not commit the Syndicate to the purchase or sale of any greater number of shares at any one time than the total amount covered by the subscriptions hereto.

7A: The Manager shall have authority to purchase Coca-Cola Common stock through any other Syndicate which he decides to become a member of, provided that the total number of shares held by the Syndicate of which he is the

Manager, plus the subscription held in some other Syndicate, does not at any time exceed 100,000 or the total number of shares subscribed.

8: The Manager may borrow, for the Syndicate account, such amounts as he may deem necessary, not to exceed the total amount due and still unpaid by the Syndicate Subscribers, and may pledge all, or any portion, of the stock so purchased by him under this agreement, as well as the unpaid balances due by the Subscribers hereto to secure any such loan or loans made by him for the Syndicate account.

9: The Manager may deal with any firm or corporation of which he is a member, or officer or employee, for the Syndicate account and no contract made by him with any firm or corporation of which he is a member or officer or employee shall be affected in any way by reason of his interest in said firm or corporation, but all such contracts shall be valid and binding as if he had no such connection with such firm or corporation.

10: The Manager shall have exclusive custody of the funds collected from the Subscribers or received from the sale of any of the stock sold by him hereunder and may deposit the same in any bank or banks, or with any New York Stock Exchange firms selected by him, and may use all of said funds in the operations of the Syndicate.

11: The total number of shares to be subscribed herein shall not exceed one-hundred thousand (100,000) shares of stock, but this contract shall become effective whenever twenty-five thousand (25,000) shares of said stock are subscribed for hereunder, and as soon as such number of shares have been subscribed for, the Manager shall notify the Subscribers, by addressing them at the address set by each Subscriber opposite his name hereto, that the Syndicate is operative.

The Manager may admit other subscribers into the Syndicate after the twenty-five thousand (25,000) shares have been subscribed for, up to one-hundred thousand (100,000) shares in his discretion and from time to time as he may see fit.

11A: Should the Manager from time to time exercise his authority to buy and sell Coca-Cola International Common Stock, such stock so dealt in shall be carried in the account as two-hundred per cent (200%) of a similar number of shares of Coca-Cola Common Stock.

12: The Syndicate shall continue for a period of ninety (90) days from the date when it is declared to be operative, as above provided for, but the Manager may, in his discretion, without consulting the other Subscribers, extend the Syndicate for an additional period not to exceed ninety (90) days from the expiration date of the first period, and said Syndicate may be extended thereafter from time to time for such additional periods as may be consented to by the subscribers to a majority in amount of the stock subscribed for herein, provided that the total period during which said Syndicate may run shall not exceed one (1) year after the date the Syndicate is declared to be operative, as aforesaid.

13: At the expiration of said Syndicate the Manager, after paying all the costs and expenses of the Syndicate and settling all of its obligations of every character and nature, all money belonging to the Syndicate and stock remaining in hand unsold, purchased for account of the Syndicate, shall be distributed pro rata among the several Subscribers in proportion to their subscriptions, and the acceptance by such Subscriber of the stock or money distributed by him, shall operate as a full and complete release of the Manager of any and all liability hereunder, whether he takes a receipt for such distributed money or stock, or money and stock, or not.

14: The Manager shall not be liable for any error of judgment or any mistake of law or fact, nor shall he be liable save for his own gross negligence or willful default; nor liable for any act done in good faith in the exercise of the powers or authority herein conferred upon him.

15: Each Subscriber ratifies, assents to and is bound by any action of the Manager assumed to be taken by him under this agreement, and will perform his undertakings herein to the extent as stated in this agreement in his proportion of the liabilities assumed herein by the Subscribers, represented by the number of shares subscribed for by him, but in no event and under no circumstances shall any subscriber be called upon to pay or be liable for any amount beyond the liability arising against him on the number of shares subscribed for by him. A failure to perform any of his undertakings hereunder shall not affect or release any other Subscriber.

16: Any notice which the Manager, or any other person to whom a Subscriber hereunder shall be liable because of the obligations assumed by him herein which such Manager or other person shall have occasion to give to a Subscriber hereunder, shall be a sufficient notice for all purposes as to its contents if given in writing, either by telegraph or by mail prepaid or postpaid, to the address of such subscriber as set opposite his signature hereon.

17: Nothing herein contained or otherwise arising shall constitute the Subscribers partners with or agents for one another or for the Managers, or render them, or any of them, liable to contribute in any event more than the interest in the Syndicate subscribed for by him.

18: This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators or assigns of the parties hereto.

19: In case of the death, resignation or incapacity to act of the Manager, a successor or successors shall be appointed in writing by the Subscribers of a majority in amount of the shares subscribed for hereunder.

20: This agreement may be executed in any number of counterparts, with the same effect as if all parties executed a single instrument.

In Witness Whereof, the Manager, in his official capacity and each of the Subscribers, including the Manager, have hereunto set their signatures, the day and year first above written.

The agreement also showed the name of each subscriber and the number of shares of participation to which each subscribed. No certificates of interest were ever issued. The agreement was carried out in accordance with its terms.

The stock purchased by the manager was never taken in the syndicate name but was left in a street name as is usual in the purchase and sale of securities on marginal accounts. About 90 percent of the stock purchased was left with the New York brokers, who pledged the stock for the balance due on the purchase price in the same manner as brokers customarily do where only part of the purchase price is paid. Approximately 10 percent was pledged directly with banks by the manager to secure more favorable interest rates from the banks than the manager could secure from the brokers. The syndicate sustained a loss up to the close of 1929, but realized a profit during the period of its existence in 1930. The Commissioner, in

determining the deficiency, held that the syndicate was an association within the meaning of section 701 of the Revenue Act of 1928 and was subject to taxation as a corporation in accordance with the provisions of section 13 (a) of that act.

The courts have laid down a number of general principles which serve as guides in the determination of whether or not in a particular case the alleged taxpayer is an association taxable as a corporation. But each case must be decided upon its own facts. See particularly, *Morrissey* v. *Commissioner*, 296 U. S. 344. The characteristics of the alleged association must be compared with the characteristics typical of a corporation. If there is sufficient resemblance, then the taxpayer is held to be an association taxable as a corporation. But if there is little similarity, then the decision must be the other way. Such a test shows that the syndicate in question was not an association taxable as a corporation. Its activities were in some respects similar to those of a corporation. It carried on a business in one sense of the word, the continuity of its existence was unaffected by the death of a subscriber, and there was a limitation of personal liability of the participants to the property embarked in the enterprise. Nevertheless, in other ways this syndicate was not like a corporation. The fact that it was limited to a short period has some tendency to distinguish it from a corporation. Other differences are the way in which title to the stock was handled; the limitations which the agreement placed upon the functions of the manager; the fact that the subscribers had no voice whatsoever in the management; the fact that there was no provision for transferring interests in the enterprise; and the fact that the syndicate was unlike a corporation in form. Cf. *Walter S. Dickey*, 14 B. T. A. 1295; *Mark L. Gerstle*, 33 B. T. A. 830; *John M. Perata*, 33 B. T. A. 843; *Darol Trading Account*, 34 B. T. A. 837; and *McCausey* v. *Burnet*, 50 Fed. (2d) 491. The case of *Vernon J. Bert, Trustee*, 34 B. T. A. 805, is distinguishable on its facts, even though the cases are somewhat similar. In that case the members not only retained control over the trustee, but actually made all decisions themselves. The agreement there provided for transferable certificates of beneficial interests and for meetings of the members. It is unnecessary to decide whether this syndicate was a partnership or a joint venture. It was not a trust. It has been taxed as a corporation, and since it was not an association taxable as a corporation, then the Commissioner has erred and there can be no deficiency.

Reviewed by the Board.

*Decision will be entered for the petitioner.*

MELLOTT, dissenting: The "primary purpose" of the formation of the syndicate was "buying and selling shares of the Common Capital stock of The Coca-Cola Company." (Art. 1, syndicate agreement.) "The parties joined in a common enterprise for the transaction of business, and the beneficiaries [subscribers] who contributed money for that purpose became associated in the enterprise according to the terms of the arrangement" just as the beneficiaries did in *Helvering* v. *Combs*, 296 U. S. 365, from which the quotation is taken. This resulted in considerable profit, the tax upon which, as determined by the respondent, amounted to $79,817.41.

The majority cite several cases in which the courts or this Board have held that there was not a sufficient resemblance between a true corporation and the entity there under consideration to justify taxing it as a corporation. Most of the cited cases were promulgated prior to December 16, 1935, on which date the Supreme Court decided *Morrissey* v. *Commissioner*, 296 U. S. 344; *Swanson* v. *Commissioner*, 296 U. S. 362; *Helvering* v. *Combs, supra;* and *Commissioner* v. *Coleman-Gilbert Associates*, 296 U. S. 369.

*Darol Trading Account*, 34 B. T. A. 837, is distinguishable from the case at bar; for as pointed out in the opinion "by no stretch of the imagination could it be said that" the petitioner was carrying on a business enterprise. But I am unable to make any such distinction between the case at bar and *Vernon J. Bert, Trustee*, 34 B. T. A. 805.

Section 701 of the Revenue Act of 1928 provides that the term "corporation" includes associations. The Supreme Court in *Morrissey* v. *Commissioner, supra*, says: "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. * * * While the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive." Elsewhere in the opinion it is pointed out that "association" implies associates and the entering into a joint enterprise for the transaction of business. If these things are present, as they are in the case at bar, we have "the distinctive features" of the creation of an entity "created to enable the participants to carry on a business and divide the gains which accrue from their common undertaking." I am of the opinion that the respondent did not err in taxing petitioner as a corporation.

BLACK, SMITH, TURNER, and ARNOLD agree with this dissent.